**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cr-00044** |
| | ) | |
| **DANIEL DINK PHIPPS** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**<u>DEFENDANT'S SENTENCING STATEMENT</u>**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

I. **Introduction**

Comes now Defendant Daniel Dink Phipps, by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on August 10, 2023.

Mr. Phipps appears for sentencing before this Court having pled guilty to each of the six counts in the Superseding Indictment, including two felonies and four misdemeanor offenses.

Mr. Phipp's conduct can be essentially encapsulated as his efforts, along with others, to <u>momentarily</u> resist the tactics employed by a line of law enforcement officers' to use their batons to push protesters off the Upper West Terrace of the U.S. Capitol after 4:30 p.m., on January 6, 2021.  Mr. Phipps reached out and grabbed hold of a police baton that was used by an officer and resulted in the individual next to Mr. Phipps to the ground.

Mr. Phipps admitted to facts that constitute felony violations of Sec. 111 (impeding or resisting law enforcement officer with the intent to commit another felony), Sec. 231 (civil disorder), as well as four misdemeanor offenses involving his presence on restricted Capitol grounds and his entrance inside the Capitol building itself when it was closed to the public.

Mr. Phipps did not engage in any violence to get into the Capitol, he did not engage in any violence to overcome police lines outside the Capitol, and he did not destroy any property either inside or outside the Capitol.

Based on a consideration of his actual conduct, a recommended Guideline Range of 27 to 33 months is the result of an incorrect application of the Sentencing Guidelines based on the facts of this case, and grossly exceeds what is necessary or appropriate when considering the Sec. 3553(a) factors as set forth in more detail below.

## II.    **The Offense Conduct**

Defendant Phipps objects to the following factual statements reflected in the PSR:

Par. 35:    The Defendant objects to the PSR's characterization of his actions as constituting the crime of "assault".

Par. 37:    Same objection as Par. 35.

Par. 39:    Same objection as Par. 35.  The facts as stated claim the Defendant only "pushed" Officer K.R., which is an insufficient factual basis to establish the crime of "assault" even if true.

Par. 40:    Same objection as Par. 35, 37, and 39.

## III.    **Sentencing Guidelines Calculation**

The Probation Officer has broken down the counts of conviction into two groups because of the offenses in Counts 1 and 2 involve different victims from the offenses in Counts 3 and 4.   multiple convictions of Sec. 111(a) do not group together under the sentencing guidelines.

As to Group 1 – Counts 1 and 2:

Par. 57    The applicable guideline is Sec. 2A2.4, and the base offense level is 10.
Three levels (+3) are added because physical contact with the law enforcement officer was involved.

Par. 59   Because the base offense level for Sec. 2A2.4 incorporates the fact that the victim was a law enforcement officer performing official duties, the "Official Victim" enhancement under §3A1.2 is not to be applied.  Application Note 2 to Sec. 2A2.4.

Par. 62   The Adjusted Offense Level for Group 1 is 13.

   <u>As to Group 2:  Counts 3 and 4</u>

Par. 63   The applicable guideline is 2B2.3.  The PSR is not specific for why it uses Sec. 2A2.2, but presumably the Probation Officer applied the cross-reference in 2B2.3(c) – that the offense was committed "with the intent to commit a felony offense," in which case the instruction is to apply the Guideline applicable to that felony offense.  On that basis, the PSR uses Sec. 2A2.2.

   There is no reference in the PSR to what other felony offense was "intended" when the violations of Section 1752(a) occurred so as to warrant application of the cross-reference, but it is presumably the felony offenses charged in Counts 1 and 2 to which Mr. Phipps also pled guilty.

   But there is no evidence that Mr. Phipps intended to commit either of those felonies – happening much later in the afternoon – when he committed the Sec. 1752 offenses by coming into the restricted grounds of the Capitol.

   The phrasing of the cross-reference makes clear that it applies when the "trespass" offense covered by Sec. 2B2.3 is done in conjunction with a plan that evidenced an intention at that moment to commit a later felony.  Here the evidence is that Mr. Phipp's felony conduct was spontaneous and in response to the use-of-force employed by the law enforcement officers.  His earlier trespass in violation of Sec. 1752 was not "with the intent" to commit those later felonies – at least there is no evidence in the record that would support that conclusion.

   The applicable Guideline for Group 2 is 2B2.3, and the base offense level is 4.

Par 70   Because the offense level for Group 2 is 9 levels less than Group 1, there is no Multi-Count Adjustment."

Par. 71   The Greater Adjusted Offense level is 13.

Par. 76       Because the Adjusted Offense level is less than 16, the maximum benefit for acceptance of responsibility is -2.

Par. 77       The Total Offense Level is 11.

      A.  Use of 2A2.4 rather than 2A2.2

The range of offense conduct that constitutes a violation of 18 U.S.C. Sec. 111(a) is extraordinarily broad.  Anyone who "assaults," "resists," "opposes," "impedes," "intimidates," or "interferes" with a covered law enforcement officers violates the statute.

Mr. Phipps admitted that his conduct in violating Sec. 111 was done with the intent to commit another felony, i.e., "civil disorder" in violation of 18 U.S.C. Sec. 231.   That finding makes the Sec. 111 offense a felony rather than a misdemeanor.

Section 111 is referenced in Appendix A as being covered by both Sections 2A2.2 and 2A2.4.

Sec. 2A2.2 is captioned "Aggravated Assault" not "Felony Assault."

Sec. 2A2.4 is captioned "Obstructing or Impeding Officers."

The PSR applies Sec. 2A2.2 without an explanation as to why that section is appropriate rather than Sec. 2A2.4 given that both are referenced in Appendix A.

This Court in United States v. De Silva, 21-cr-00564 (CJN) has previously held that "Simple assault," as used in 18 U.S.C. § 111(a), means (a) an attempt to cause or purposely, knowingly, or recklessly cause bodily injury to another; or (b) negligently cause bodily injury to another with a deadly weapon; or (c) attempt by physical menace to put another in fear of imminent

serious bodily injury, citing United States v. Duran, 96 F.3d 1495, 1509 (D.C. Cir. 1996).

    a.  "Assault" -- Nature and Circumstances of the Sec. 111(a) Offense:

It is not contested that no officer was injured as a result of Mr. Phipps' actions.  My Phipps' conduct in attempting to prevent a baton from continuing to be employed to push against protesters did not involve any physical blows delivered by Mr. Phipps, nor did he attempt to do so.

The Government has provided in discovery video evidence of two encounters between Mr. Phipps and various Law Enforcement Officers between 4:35 and 4:39 pm, on January 6.

It goes without saying that by 4:35 pm, law enforcement officers from multiple agencies had for more than 3 hours been battling the crowd for control of the grounds around the Capitol building.

As noted in the PSR, in Sentencing Video P5, Episode #1 can be seen starting at 4:35:20. The PSR includes only one still image from this one video – with the last four letters of the ID number being "BELN" in the upper right corner – as evidence of the first "assault" at around 4:35:30 seconds.  The PSR describes the "assault" as happening when Mr. Phipps "pushed with his hands against the officer".  Here are a series of still images from this first Episode:



That is Mr. Phipps facing the camera with his flag in the foreground in front of him.  This is almost the same image as reflected in the PSR.

One second later, here is an image of Mr. Phipps holding up his arm to block an officer behind a shield from hitting him with a baton:



Two seconds later Mr. Phipps is upright looking at the Officers behind a wall of shields.  The view of Mr. Phipps from this particular BWC is at times obscured by other officers, and by Mr. Phipps going in and out of the frame of the video as the Officer wearing the BWC shifts his body.



It is impossible to know from this video, which is the only visual evidence referenced in the PSR, as to what moment in time it was that Mr. Phipps is said to have "pushed" an Officer such that his actions amounted to "assault."

Episode #2 begins approximately two minutes after the events depicted in Episode #1 above. Episode #2 begins at approximately 4:38:42, and lasts a total of 11 seconds.

Sentencing Video P3 is the BWC of Officer #2, who is easily spotted as he was carrying an orange pepper spray delivery device when he engages with Mr. Phipps in Episode #2. On Video P3 Officer #2 can be clearly heard directing persons in front of him to "Back Up." Mr. Phipps first appears to the Officer's right side at 4:38:28, approximately 10 feet away.



Video P3 shows that Mr. Phipps was slowly taking steps backwards as the line of Officers approached, including Officer #2 and Officer #1.

At 4:38:43, Officer #1, directly in front of Mr. Phipps', steps forward and "cross-checks" the person immediately to Mr. Phipps' left, hitting him across the chest with his baton and driving him backwards.  The individual had done nothing at that point other than not back up as quickly as Officer #1

demanded:



What happens next between Mr. Phipps and Officer #1 happens outside the frame of Officer 2's BWC video, but other video shows that Mr. Phipps grabbed the baton Officer #1 had used and pushed back to create space for the individual just struck.

Mr. Phipps then pulls away from Officer #1, but that brings him into the poth of and contact with Officer #2.  Sentencing Videos P1 and P2 are BWC vides from other officers standing a few feet away.  Officer 2's BWC was too disrupted by his encounter with Mr. Phipps and nothing can be seen clearly.

At 4:38:43, Video Exh. P1 first shows Mr. Phipps and an Officer #2 come into the frame with the Officer #2's right hand grasping Mr. Phipps' jacket collar on his right side – Officer #2 reached across Mr. Phipps' neck to grab hold of the collar – and pulling Mr. Phipps towards him.  This is 3 seconds after Officer #1 had cross-checked the individual as shown in the still image above.

Below is a series of still images take from Exhibits P1 and P2 – videos from BWC's in roughly the same position, but with slightly different angles of Episode 2.

The first image below shows Officer #2 grabbing Mr. Phipp's collar at :47 seconds.



As the sequence of photos below – separated by 1 second intervals -- make clear, Mr. Phipps is not advancing -- he is attempting to retreat while pushing back against two or more officers who were engaging him.





From this moment – two seconds after the first image above – Mr. Phipps had lost control of an American flag he had carried over his shoulder the entire day.  The remainder of the encounter between Mr. Phipps and the officers was him trying to regain control of that flag.

Two seconds after the above image you can see what is believed to be Officer #1's gloved hand on a baton as it's being used against Mr. Phipps' head.



One second later the baton is continuing to be used high – at about the level of Mr. Phipps' neck.





Although somewhat obscured by the baton in this image, one second later Mr. Phipps has regained control of his flag and has separated himself from the three officers by 5-6 feet. A total of 6 seconds elapsed from the first image to the last image above which was the total of the engagement between Mr. Phipps and Officer #2.

Another image below is from a different BWC in almost the same position as the one above. At 4:38:50 – 3 seconds into the encounter – it is clear that Officer #2 is the aggressor in the encounter with Mr. Phipps.



One second later Officer #2 has pushed Mr. Phipps away, while

maintaining a grasp of some looped object that Mr. Phipps was wearing on his

clothing:



One second after that, the next image shows the Officer having pulled

Mr. Phipps back close to him and the second officer then uses his baton

against Mr. Phipps' head as also seen in the images above:



Two seconds after that, Mr. Phipps had recovered control of his flag, Officer #2 released his grip on the looped object, and Mr. Phipps had moved away from the three officers.

For this sequence of events the PSR says Mr. Phipps "assaulted" one or more of the officers in this sequence of events.

### b. Section 111(a) and Guideline Section 2A2.4.

With respect to whether Mr. Phipps should be sentenced based on "Aggravated Assault" (Sec. 2A2.2) under the Guidelines as opposed to "Obstructing or Impeding Officers" (Sec. 2A2.4), the key to answering that question is the actual conduct of Mr. Phipps in committing the Sec. 111(a) violation.  He has not made any factual admission with regard to having "assaulted" any officer.  He did admit to resisting, impeding., etc., the Officers as they attempted to clear the West side of the Capitol of protesters.  There is no admission that by his conduct he intended to purposely or recklessly cause bodily injury to any of the officers.

Both episodes, and all the encounters with law enforcement officers in those two episodes, fit within offense conduct covered by Sec. 2A2.4 – captioned "Obstructing or Impeding Officers."  That's exactly what he did, and Section 2A2.4 is the applicable Guideline provision.

### 2. The Cross-Reference In Sec. 2A2.4(c)(1) Does Not Apply.

Because 2A2.4 is the appropriate Guideline when taking into consideration the nature and specific actions of the offense conduct, there remains the issue of whether the Cross-Reference in Sec. 2A2.4(c)(1)

nevertheless directs the Court back to Sec. 2A2.2.  The Cross-Reference provides that if the offense conduct involves "aggravated assault", the Court should apply Sec. 2A2.2.[1]

The structure of Section 111(a) created by Congress establishes misdemeanor and felony versions of a wide range of prohibited conduct.  The misdemeanor version of the crime is defined by what is not present – no physical contact/no intent to commit another felony.  When either additional factor is present, the Sec. 111(a) violation is a felony, subject to a maximum term of 8 years in custody.

Subsection (b) does not define a felony – it defines an "aggravated" form of the felony defined in Subsection (a).  The application of Subsection (b) depends on the presence of one or more specific aggravating factors.

Section 111(a) reads as follows in pertinent part:

(a) In General. —Whoever—

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; ...

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

---

[1] The Probation Officer has expressly rely on the cross-reference, but instead opted to apply Sec. 2A2.2 without explaining the basis for that decision, but presumably on the basis that the offense conduct is an "assault."

The statutory text makes no reference to "aggravated assault" in connection with a Sec. 111(a) violations.  It only differentiates between "misdemeanor" and "felony" versions of that offense.

Section 111(b) includes additional factual findings – serious bodily injury results or a dangerous or deadly weapon was used.  Such additional facts create an "aggravated" form of the felony, increasing the maximum penalty from 8 to 20 years.

The problem with the cross-reference in Guideline Section 2A2.4(c) stems from the fact that it reads "If the *conduct* constituted *aggravated assault*, apply §2A2.2 (Aggravated Assault)."  [Emphasis added].

The reference is to "conduct" must be read as the facts of the offense and not the statutory charge.

Further, "aggravated assault" is not a phrase used in the statute or in Section 2A2.2 itself.

The definition of "aggravated assault" in the Guidelines is found only in the Commentary.  The definition reads:

> "Aggravated assault" means ***a felonious assault*** that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.  [Emphasis added].

The definitional subsections (A), (B), and (C) do not apply.  That leaves the question of whether (D) should be followed, thereby sending the Court back to Sec. 2A2.2.

But the premise for the application of all four is that there must be a "felonious assault." If, as argued above, Mr. Phipps' offense conduct violated the broad spectrum of prohibited conduct under Sec. 111 – but did not meet the definition of "criminal assault" -- an "aggravated assault" is not within the facts of the case. It is nonsensical to rely on an aggravated form of an underlying crime that didn't occur as part of the Guideline calculation.

### 2. The Sentencing Guidelines' Definition of "Aggravated Assault" is Unreasonable and Not Entitled to Deference

The definition of "aggravated assault" is found not in the Guideline itself, but only in the commentary to the guideline. This distinction is important because the commentary to the Sentencing Guidelines is not accorded the full force of the guideline, but rather is considered as "an agency's interpretation of its own legislative rule." Stinson v. United States, 508 U.S. 36, 44 (1993). This Circuit has said that the Sentencing Guideline's application notes do not qualify for deference under Stinson if they "expand[] rather than interpret[] the Guideline." United States v. Winstead, 890 F.3d 1082, 1091 (D.C. Cir. 2018). Further, the Supreme Court recently stated there are important limits to the deference courts give to an agency's interpretation of its own rules. See generally Kisor v. Wilkie, 139 S. Ct. 2400, 2424-2418 (2019).

To be granted deference, the agency's interpretation must be of a regulation that is genuinely ambiguous. Kisor, 139 S. Ct. at 2415. Genuine ambiguity cannot be determined based solely on the plain language of the regulation. Instead, courts must exhaust all the "traditional tools" of

construction, including consideration of the text, structure, history and purpose of the regulation. Id. (citations omitted).

The United States Sentencing Commission created three separate guidelines for assaultive conduct:  Aggravated Assault (§2A2.2), Assault (§2A2.3) and Obstructing or Impeding Officers (§2A2.4).

Congress created a different structure in Sec. 111 for "Assaulting, Resisting, or Impeding Certain Officers," one that includes three classes of criminal responsibility:

> 1)  simple assault, a misdemeanor punishable by not more than 1 year;
>
> 2)  assault involving physical contact with an officer, or the intent to commit another felony, punishable by up to 8 years; and
>
> 3)  assault involving a dangerous weapon or bodily injury, punishable by up to a maximum of 20 years.

Congress separated Subsection 111(b) and explicitly titled it "Enhanced Penalty," making a clear distinction in the statute with both the structure of the statute and the escalating maximum authorized punishments.  The only offenses that qualify for an "enhanced penalty" of up to 20 years in prison are those that involve a dangerous weapon or bodily injury.

Physical contact and the "intent to commit another felony" make the offense a felony – the intermediate classification -- and subject the defendant to a greater potential sentence than simple assault, but not within the category of an enhanced penalties of Sec. 111(b).  The structure of the statute creates a misdemeanor, felony, and aggravated felony version of the offense.  Section

111(b) is the "aggravated" form of the felony version of the offense, and only applies in facts involving actual assault.

These distinctions, enacted by Congress, provide important context when determining the how much consideration should be given to the Commentary definition of "aggravated assault." The Guidelines are only advisory, and the Commentary only offers guidance – it is not binding.

The commentary involves four categories of what offenses the Commission deems to be "aggravated assault."  Three of them are directly tied to Congress' statutory framework in Sec. 111(b) – the aggravated form of the felony as defined in the statute:

1) use of a dangerous weapon,

2) bodily injury, and

3) strangulation, which by its nature carries a serious risk of bodily injury. See USSG § 2A2.2, Application Note 1.

The 4th category – "intent to commit another felony" – is unrelated to bodily injury or the risk thereof, and has no connection to the "aggravated" form of the felony set forth in the statute.  The definition in the commentary lifts the "intent to commit another felony" variation – the intermediate classification – and deposits it with the more serious forms of "aggravated" felony found in the statute.

In the application of the cross-reference, the commentary creates an equivalency for felonies that Congress has expressly differentiated with 8 and

20 year maximum penalties.  They are not, and should not be treated equivalently in the Guidelines.

The Commentary definition made the "intent to commit another felony" prong of Sec. 111(a)(1) equivalent to the "bodily injury" and "deadly or dangerous weapon" aggravated forms of assault under Sec. 111(b), even though the statutory maximums for the two vary by 12 years.

Further -- without explanation -- the Commentary does not elevate the "physical contact" prong of Sec. 111(a)(1) into the definition of an "aggravated assault."  There is no justification for the Sentencing Commission to treat the two prongs of Sec. 111(a)(1) – both of which work to make misdemeanors into equal felonies -- differently from each other under the Guidelines in clear disregard for what Congress created in the statute.

For these reasons, USSG § 2A2.2 is not genuinely ambiguous and thus no deference should be given to the commentary that elevates "intent to commit another felony" as an "aggravated assault."  The definition of what constitutes an "aggravated assault" can be determined directly through the traditional tools of construction by examining the relevant statute directly, and the Commentary in the Guidelines is entitled to no deference.

Even if the Court were to find Sec. 2A2.2 is genuinely ambiguous, and the Commentary definition was instructive, an agency's interpretation must still be "reasonable" for it to control.  Kisor ,139 S. Ct. at 2415 (citation omitted). There the Supreme Court was clear: "And let there be no mistake: That is a requirement the agency can fail." Id. at 2416.

The Sentencing Commission's definition fails the reasonableness test by contravening the statutory framework because it makes assaults with the "intent to commit another felony" equivalent to assaults involving the use of a deadly weapon or risked bodily injury.  That is an unreasonable interpretation given the statutory framework. An intent to commit another felony, by itself, does not make an assault equally serious as one that creates risk of bodily injury or employed a deadly weapon.

The Court should use Sec. 2A2.4 as to Count 1.  This common-sense approach to the facts and the Guidelines shows that Sec. 2A2.4 is the guideline that most appropriately fits the facts of this case.

While Mr. Phipps has no criminal history points as determined by the United States Probation Officer in the Presentence Report, it would be disingenuous to suggest that Mr. Phipps has led a "law abiding" life.  The PSR reflects numerous encounters with law enforcement throughout this adult life.  But for purposes of establishing his criminal history category, none of the encounters qualifies under the Sentencing Guidelines for "points" in his criminal history score.  While not an excuse for numerous failures to attend to his problems when lawfully required to do so, it is a fact that many of Mr. Phipps' past violations have involved driving offenses, licensing offenses, and his failures to follow through and correct defects with regard to both.

Further, the most recent offense is from 2014, and before that the next most recent offense was in 2010.

As a result, Mr. Phipps Criminal History Category I.

Based on a Total Offense Level of 11, and a Criminal History Category of I, Mr. Phipps' advisory Guideline Range is 8-14 months -- in Zone B of the Sentencing Table and making him eligible for a sentence of probation if the court imposes term of probation that includes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention for the minimum term of the Guideline Range – 8 months.

## IV.  **Sentencing Factors Under Sec. 3553(a)**

Pursuant to 18 U.S.C. § 3553(a), the numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to Mr. Phipps' background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

1.  Nature and circumstances of the offense and the history and personal characteristics of the defendant.

a.  The Nature and Circumstances of the Offense.

As many Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence to disrupt the congressional certification of the 2020 Electoral Vote.

2) a larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with the

reported outcome of the 2020 Presidential election -- but with no predetermined intention to engage in violent behavior towards law enforcement or any other individuals.  Some substantial numbers of these individuals were drawn into committing acts of violence once on the Capitol grounds or inside th Capitol itself; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

The facts applicable to Mr. Phipps' conduct on January 6, 2021, place him in the third group, notwithstanding his encounters with law enforcement late in the afternoon.   Mr. Phipps came to Washington D.C. to attend the "Stop the Steal" rally on the Ellipse, and then joined with the crowd at the urging of speakers to travel to the Capitol to voice his frustration and unhappiness with the electoral processes and outcome.

For several hours Mr. Phipps was just one among a sea of individuals outside the Capitol.  He did make brief entry into the Capitol but exited the building after doing nothing more than taking a few pictures.  He did not engage in any acts of violence either on his way to the Capitol building entrances, as part of his efforts to get inside the building, or his conduct while inside the building.

It was only late in the afternoon, after police had retaken control of the Capitol building, and were beginning to "herd" the remaining protesters off the Capitol grounds with non-lethal force, that Mr. Phipps had the first of his two physical encounters with Officers trying to "move the crowd along."  Mr. Phipps

was in a location he was not lawfully entitled to be, and he did not heed and obey the lawful commands given to him by the Officers to disperse and leave the Capitol grounds.

<u>History and Personal Characteristics of Mr. Sandoval.</u>

The PSR accurately captures Mr. Phipps' biographical history.   He finds himself at a cross-roads – no longer so young as to make a "new start" for himself, but with plenty of life left ahead of him that to waste that time by continuing on the path he is on would be tragic.

But there is one significant factor in his life that is not adequately captured in the PSR, and it hopefully will influence this Court's exercise of discretion under Sec. 3553a.

As the PSR notes, Mr. Phipps is unemployed and has been unsuccessful in seeking employment for an extended period of time.  He has worked as an armed security guard in Texas in the past, but the conditions of his pretrial release make continuing in that line of employment not possible.

But Mr. Phipps lives with his elderly mother and, along with his brother is her primary caregiver.  As noted in the PSR, she suffers from Lupus, her overall health is declining – including her mental health as she is exhibiting signs of an onset of dementia -- making increasingly housebound and unable to travel on her own to deal with her medical and personal needs.

Mr. Phipps' brother shares the caregiver role with him.  But Mr. Phipps' brother is currently facing a likely revocation of his probation and will be

returned to prison in Texas in the weeks ahead.  That will leave Mr. Phipps' as his mother's only care giver.

In addition, Mr. Phipps has owned a "Service Animal" for himself for seven years.  He obtained the animal and put it into training when it was 10 weeks old.  Mr. Phipps has no one to care for that animal, and his mother will not be able to care for that animal if he is sentenced to a term of imprisonment.

DEFENDANT'S SENTENCING RECOMMENDATION

Daniel Phipps came to Washington D.C., on January 6 to attend the Stop the Steal rally at the Ellipse.  After the rally he marched to protest at the U.S. Capitol the announced outcome of the 2020 Presidential Election.  While engaged in that protest, and after being at the Capitol peacefully and without incident himself for a period of hours, late in the afternoon he had two brief physical encounters with law enforcement officers who were engaged in their lawful duty to clear the Capitol grounds.  Mr. Phipps was too slow to respond to their lawful command for him to depart from the grounds.  Their more "demonstrative" commands – via their actions – that Mr. Phipps and others do so led to two brief episodes of scuffling where no blows were struck, no weapons were used, and no one was injured.

Mr. Phipps chose to bring this matter to a conclusion by pleading guilty to each offense with which he was charged.  His choice included an admission to resisting, impeding, obstructing, etc., the officers who gave him directions that he did not follow.

That is what he did, that is the offense conduct and relevant conduct relevant to his case, and it is for that offense that he should be sentenced.

Given Mr. Phipps' longstanding pattern of involvement with law enforcement, it is most appropriate for him to focus on the middle of the guideline range.  That recognizes both the pattern exists, but that the nature of his prior history is such that he has not accumulated criminal history points for his guideline calculation here.

Because a sentence of probation is authorized if a term of that probation is a period of home detention equal to at least the minimum term, Mr. Phipps requests a sentence of two (2) years probation, which shall include a condition that he be subject to 11 months of home confinement.

This sentence is appropriate under the facts, it is appropriate under the Sentencing Guideline calculations, and it takes into consideration the relevant 3553(a) factors that are present.


Date: August 4, 2023                          Respectfully Submitted,


                                              /s/ William L. Shipley
                                              William L. Shipley
                                              PO Box 745
                                              Kailua, Hawaii 96734
                                              Tel: (808) 228-1341
                                              Email: 808Shipleylaw@gmail.com

                                              *Attorney for Defendant*